<u>NOT FOR PUBLICATION</u>                [Dkt. Items 85 and 95]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

XL SPECIALTY INSURANCE COMPANY,

            Plaintiff,

    v.

TORCHIO BROTHERS, et al.,

           Defendants.

Civil No. 07-2330 (RMB)

**OPINION**

Appearances:

    Craig H. Parker
    Eric J. Hughes
    Ryan P. Mulvaney
    McElroy Deutsch Mulvaney & Carpenter
    1300 Mount Kemble Avenue
    P.O. Box 2075
    Morristown, NJ 07962-2075
        Attorneys for Plaintiff

    Stephen Frederick Funk
    Jacobs & Barbone, PA
    1125 Pacific Avenue
    Atlantic City, NJ 08401
        Attorney for Defendants

**BUMB**, United States District Judge:

I.   **Introduction**

Plaintiff XL Insurance Company (hereafter "XL") moves for partial summary judgment on its contractual indemnification claim against Defendants Donald Baldi and Doreen Riordan Sarma.[1]

---

[1] The motion was also filed against Anthony S. Antonelli, who was administratively terminated from this case after he filed bankruptcy. <u>See</u> Docket No. 89.

Defendants move for Summary Judgment as to their Amended

Counterclaim.  For the following reasons, Plaintiff's motion is

granted, and Defendants' Motion is denied.

## II.  BACKGROUND

### A.   The Indemnity Agreement

On February 17, 2004, Torchio Brothers, Inc. ("Torchio

Brothers"), Gregory V. Torchio, Vincent A. Torchio, Donald T.

Baldi, Anthony S. Atonelli and Doreen Riordan Sarma (collectively

the "Indemnitors") executed and delivered a General Agreement of

Indemnity (the "Indemnity Agreement") in favor of XL, as

indemnitee, in order to induce XL, as surety, to issue bonds on

behalf of Torchio Brothers, as principal.  See Bieda Decl.,

Exhibit A.

Pursuant to Article V of the Indemnity Agreement, the

Indemnitors agreed that:

> [The Indemnitors] shall exonerate, hold harmless,
> indemnify, and keep indemnified [XL] from and against any
> and all losses, liabilities, damages, demands for payment or
> performance, expenses and costs of whatsoever kind or nature
> including, but not limited to, interest, court costs,
> document reproduction and storage charges, investigative
> expenses and costs, adjusting, expert and attorney fees
> imposed upon, sustained or incurred by [XL] by reason of (1)
> [XL] having executed, provided or procured BOND(S) in behalf
> of [Torchio Brothers]; (2) [the Indemnitors'] failure to
> perform or comply with any of the provisions of this
> AGREEMENT; (3) [XL] enforcing any of the covenants or
> conditions of this AGREEMENT; (4) [XL] conducting any
> investigation, obtaining or attempting to obtain a release,
> or recovering or attempting to recover loss or unpaid
> premium in connection with any BOND(S); and/or (5) [XL]
> prosecuting or defending any action or claim in connection
> with any BOND(S) executed[,] provided or procured in behalf

of [Torchio Brothers], whether [XL] at its sole option elects to employ its own counsel, or permits or requires [the Indemnitors] to make arrangements for [XL's] legal representation.

Id. at Section V.  Pursuant to Article XI, the Indemnitors further agreed that "[i]n order to secure [the Indemnitors'] obligations to [XL] under this AGREEMENT and any other indebtedness and liabilities of the [Indemnitors] to [XL], whether heretofore or hereafter incurred," the Indemnitors would assign to XL "all right, title interest and estate of [the Indemnitors] in and to all property" including, but not limited to, "all money, cash, cash equivalents, bank accounts, deposits (checking or savings), certificates of deposit, securities, bonds and negotiable instruments."  Id.

**B.    XL Executed the Surety Bond on Behalf of Torchio Brothers**

On August 1, 2005, the Borelli Agency ("Borelli"), as bond agent for XL, issued a payment bond and performance bond ("the bond") in connection with a construction contract entered into by Torchio Brothers, thus obligating XL as surety.  See Bieda Decl., Exhibit C.  Torchio Brothers's Notice to Proceed on the bonded contract was also dated August 1, 2005.  See Bieda Decl., Exhibit B.

When XL received notice of the contract, Robert Dixon of XL, contacted Robert Myers of Borelli, by e-mail dated August 1, 2005:

3

> We've received your fax enclosing the Washington BOE
> contract (New Green Elementary School - $4,789,600).  As we
> communicated nearly a month ago when asked to support a bid
> to the State of NJ, we understand you've been working with
> Zurich/Souder to replace XL as surety.  Given Souder's high
> opinion of Torchio and the time that's elapsed, we're very
> surprised to hear that Zurich is not yet on board.
>
> Notwithstanding the fact that XL has withdrawn from the
> surety business, our underwriting file is now out of date.
> We suggest you provide Zurich/Souder whatever remaining
> underwriting information may be required to close on a new
> surety facility and press them for support of the final bond
> for Washington BOE.

See Defs. Counter Statement of Material Facts, Ex. 6.  XL had

apparently made the decision to exit the surety business in April

2005.  See Bieda Supplemental Decl. ¶ 14.

On August 4, 2005, upon XL's receipt of Borelli's bond

execution report, Mr. Dixon sent Mr. Myers a second e-mail asking

him to "[p]lease advise how you derived XL's authorization to

issue this bond from my August 1st e-mail communication."  Id.

Mr. Myers responded the same day:

> In my opinion your file should be complete but if it is not
> complete, please advise whatever you may need.  We had
> forwarded everything that was needed in May or June.  In so
> far as your email of 8/4/05 at 1:42PM, when I spoke to you
> at 9:15AM on 8/1/05 on the telephone, I advised you that
> Zurich was not in a position to issue the performance bond
> and that Mr. Torchio needed the bond for a meeting on 8/1/05
> in the afternoon.
>
> I strongly disagree with your email stating that I exceeded
> XL authorization when I spoke to you at 9:15AM and you knew
> the situation.  I have been in the surety business for 33
> years and never issued a bond without authorization.

Id.  The next day, Mr. Dixon sent Mr. Myers a letter stating that

XL was "in receipt of The Borelli Agency's report of execution of

4

a $4,789,600 performance and payment bond" and that the "bond was issued by Borelli without it first obtaining the requisite authorization from XL." Id.  The letter placed Borelli "on notice that, to the extent XL shall run into any problems as a result of Borelli's unauthorized issuance of this bond, XL shall look to Borelli for exoneration and indemnification of any and all damages it incurs." Id.

### C.   XL's Indemnification Claim

On April 9, 2007, Torchio Brothers issued a voluntary letter of default to the owner and obligee of the bond, the Washington Township Board of Education.  Plaintiff's Statement of Facts ("Pl.'s SOF") ¶ 12.  As a result of Torchio Brothers' default, XL received numerous claims under the bond.  XL was required to satisfy debts owed by Torchio Brothers in a total amount of $561,912.12.  Pl.'s SOF ¶ 17; Bieda Decl., Ex. E.  In addition, XL spent $17,781.38 to investigate the claims made against Torchio Brothers.  Pl.'s SOF ¶ 20; Bieda Decl., Ex. F, G.

XL filed a Complaint against the Indemnitors seeking contractual indemnification on May 17, 2007.  See Docket No. 1. All of the Indemnitors except Defendants Baldi and Sarma have filed for bankruptcy.  See Docket Nos. 80, 81, 83 and 88.  XL now moves for partial summary judgment against these Defendants.

5

**III. Standard**

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P. 56(c); <u>Hersh v. Allen Products Co.</u>, 789 F.2d 230, 232 (3d Cir. 1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249.

"In making this determination, a court must make all reasonable inferences in favor of the non-movant." <u>Oscar Mayer Corp. v. Mincing Trading Corp.</u>, 744 F.Supp. 79, 81 (D.N.J. 1990) (citing <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983), <u>cert. dismissed</u>, 465 U.S. 1091 (1984)).  However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the...pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed.R.Civ.P. 56(e)); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

6

**IV.  Analysis**

Defendants agreed to indemnify XL for any losses relating to surety bonds executed on behalf of Defendants' employer, Torchio Brothers.  Defendants have not disputed the amount of XL's claims/damages under the bond at issue here.  Rather, Defendants Baldi and Sarma argue that information concerning XL's intention to exit the surety business and about XL's reluctance to issue the bond on behalf of Torchio Brothers was fraudulently withheld.  The reasonable inference, Defendants argue, is that XL's reluctance to issue the bond was due to doubts about Torchio Brothers' financial condition, and had Defendants known of XL's position, Defendants would not have entered into or would have cancelled their indemnity agreement with XL.

**A.    XL Owed Defendants No Duty to Disclose**

The first issue presented is whether or not XL even had a duty to disclose to the Defendants its desire to exit the surety business or its dispute with Borelli.  Although Defendants argue that XL had some duty to disclose, Defendants have failed to support this argument with either record fact or case law.[2]

_____

[2]     After oral argument on XL's Motion for Partial Summary Judgment, the Court permitted supplemental briefing on the issue of XL's duty to disclose information to Defendants.  Rather than address this issue, Defendants argued in their brief that the waiver of notice provision in the Indemnity Agreement is ambiguous.  Specifically, Defendants argue that the terms "fact, act or information" that concerns or affects the rights or liabilities of XL or the Indemnitors are undefined.  <u>See</u> Bieda Decl., Ex. A, Section XIV.  XL cites cases where similar waiver

The law is clear that "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'" Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1185 (3d Cir. 1993).[3]   Categories of relationships that give rise to a duty to disclose include:  "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the

_____

language was found unambiguous and enforceable.  See Travelers Indem. Co. v. Ballantine, 436 F.Supp.2d 707, 712 (M.D.Pa. 2006) ("Based on this language, we must agree with Travelers that the Defendants waived notice of facts that affected their liability under bonds issued pursuant to their indemnification agreement"); The Travelers Indem. Co. v. Harrison Construction Group Corp., No. CV 06-4011, 2008 WL 4725970, at *5 (E.D.N.Y. Oct. 22, 2008).
The waiver of notice language, however, concerns information that affects the rights or liabilities of the Indemnitors.  For the reasons set forth in this Opinion, Defendants have failed to show how the information at issue here, XL's decision to leave the surety business and the dispute with its bond agent, would affect the rights or liabilities of the Indemnitors under the Indemnity Agreement.  Therefore, the notice of waiver language is irrelevant to the question before this Court-whether XL is entitled to summary judgment on its contractual indemnification claim.

[3]     Although the Indemnity Agreement does not appear to contain a forum selection clause, the Court notes that Defendants seek to file their fraud and negligent misrepresentation claims pursuant to New Jersey law.  See Defs.'s Opp. Br. at 3. Plaintiff objects to these claims but has not questioned that New Jersey law would apply.  Therefore, the Court assumes for the purpose of these motions that New Jersey law governs the claims raised by Defendants.

circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." <u>Id.</u> (citing <u>Berman v. Gurwicz</u>, 189 N.J.Super. 89, 93-94 (Ch. Div. 1981), <u>aff'd</u>, 189 N.J.Super. 49, (App.Div.), <u>certif. denied</u>, 94 N.J. 549,(1983)).

Defendants have not pointed to any inaccurate statements made by XL, which would otherwise require clarification.  Nor can XL's relationship with Defendants, which was "primarily a detached business relationship," qualify as a "special relationship" requiring some heightened duty of care.  <u>Id.</u>  In sum, Defendants have not established that XL violated any disclosure duty owed to Defendants.

**B.   Defendants' Cannot Establish that Their Assent to the Indemnification Agreement Was Fraudulently Induced.**

Defendants also argue that the Indemnity Agreement should be rescinded because XL "misrepresented and omitted material facts regarding the circumstances under which Baldi and Sarma executed the indemnification agreement." Defs. Opp. Br. at 2.  But even if a duty to disclose existed, the undisputed record facts show that XL made the decision to exit the surety bond business in April of 2005--<u>more than a year after Defendants signed the indemnity agreement dated February 17, 2004</u>.  The documents evidencing a dispute between XL and its bonding agent, the Borelli Agency, date the dispute as occurring in August 2005.

9

Therefore, Defendants' argument that they would not have <u>entered into</u> the Indemnity Agreement, which was signed in February 2004, had they known about XL's plan to exit the surety business or that XL did not want to issue the surety bond to Torchio Brothers is without any support in the record.

The question remains, however, if Defendants could have cancelled the Indemnity Agreement <u>before</u> becoming obligated under the bond at issue here.  Defendants have failed to demonstrate how information regarding XL's decision to exit the surety business more than a year after entering the Indemnity Agreement would be material to Defendants' indemnification obligation to XL.  XL's exit from the surety business could not trigger any new rights or responsibilities under the Indemnity Agreement because Defendants would have had no indemnity obligation if XL did not issue any new surety bonds on Torchio Brothers' behalf.[4]

---

[4]    The language triggering Defendants' indemnity obligations is as follows:

> [The Indemnitors] shall . . . indemnity . . . [XL] from and against any an all losses . . . sustained by [XL] by reason of (1) [XL] having executed, provided or procured BOND(S) in behalf of [Torchio Brothers]; (2) [the Indemnitors'] failure to perform or comply with any of the provisions of this AGREEMENT; (3) [XL] enforcing any of the covenants or conditions of this AGREEMENT; (4) [XL] conducting any investigation, obtaining or attempting to obtain a release, or recovering or attempting to recover loss or unpaid premium in connection with any BOND(S); and/or (5) [XL] prosecuting or defending any action or claim in connection with any BOND(S) executed[,] provided or procured in behalf of [Torchio Brothers], whether [XL] at its sole option elects to employ its own counsel, or permits or requires

Additionally, Defendants argue that "[t]he failure on the part of XL to tell Baldi and Sarma . . . about its allegation against Borelli and Myers constituted a material omission that Baldi and Sarma should have been allowed to consider and rely upon in order to determine whether or not they wished to remain on the indemnity agreement." Defs. Opp. Br. at 3.  Defendants, however, do not state they would have terminated the agreement.[5] Rather, Defendants provided Declarations stating that information concerning the dispute with Borelli was "obviously material to my decision on whether to remain on the indemnification agreement." Baldi Decl. ¶ 8; Sarma Decl. ¶ 8.  It is simply too speculative for Defendants to argue now, after XL honored its obligation under the bond and has turned to Defendants for indemnification, that if Defendants had known about the dispute with Borelli in 2005, then they might have cancelled their Indemnity Agreement prior to the bond being executed and been relieved of their indemnity obligation.  See Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 228 (3d Cir. 2009) (citing

---

[the Indemnitors] to make arrangements for [XL's] legal representation.

See Bieda Decl., Exhibit A, Section V.

[5]    The record demonstrates that there would have been little basis for Defendants to terminate the Indemnity Agreement. XL honored its surety obligations, and Torchio Brothers did not default on the bonded contract at issue here until April 9, 2007-two years after the dispute with Borelli.  Pl.'s SOF ¶ 12.

Lexington Ins. Co. v. W. Pa. Hosp., 423 F.3d 318, 332-33 (3d Cir.
2005)) ("speculation and conjecture may not defeat a motion for
summary judgment").

Moreover, given the e-mail exchange between XL and Borelli,
and the fact that the bond was issued on August 1, 2005, it
appears that the earliest XL could have learned that the bond was
issued on XL's behalf was the very day they were issued. See
Bieda Decl., Exhibit C; See Defs. Counter SOF, Ex. 6. The
Indemnity Agreement states that termination "shall not be
effective until thirty (30) days after receipt of said written
notice by [XL]," and that "[s]uch termination shall not relieve
[the Indemnitors] from liability to [XL] arising out of . . .
BOND(S) executed prior to such termination." See Bieda Decl.,
Exhibit A, Section XIX. XL could not have notified Defendants
prior to Borelli's bond execution because XL itself was
supposedly unaware of Borelli's actions.

Nor does the e-mail exchange between XL and Borelli support
any inference that XL's reluctance to issue the surety bond on
Torchio Brothers' behalf was some type of commentary by XL on
Torchio Brothers' financial condition. To the contrary, XL
indicates its impression that another surety company had a high
opinion of Torchio Brothers. See Defs. Counter SOF, Ex. 6
("Given Souder's high opinion of Torchio and the time that's
elapsed, we're very surprised to hear that Zurich is not yet on

12

board.").  XL further clarifies for Borelli that "XL has
withdrawn from the surety business" and suggests that Borelli
"provide Zurich/Souder whatever remaining underwriting
information may be required to close on a new surety facility and
press them for support of the final bond for Washington BOE."
Id.  The e-mail simply does not indicate that XL had concerns
about Torchio Brothers.  Nor do the later e-mails, which focused
on XL's concern that Borelli issued the bond without approval,
provide any factual basis for the inference that XL was reluctant
to issue the bond because XL was concerned about Torchio
Brothers' financial condition.

     Finally, even though the August 1 e-mail from XL to Borelli
indicates that some communication from XL to Borelli occurred
"nearly a month" prior to the August 1 e-mail concerning XL's
disinterest in "support[ing] a bid to the State of NJ," it is
simply too speculative to interpret this communication as any
commentary by XL on Torchio Brother's financial state.  See Defs.
Counter SOF, Ex. 6.  This is particularly so where, by that time,
XL had already made the decision to withdraw from the surety
business, which could certainly account for XL's disinterest in
sponsoring the New Jersey bid.  Id.

     In short, Defendants simply have not established that XL's
reluctance to provide the surety bond to Torchio Brothers was
based on any specific concern about the company.  Absent this

13

connection, XL's dispute with Borelli cannot be viewed as material to Defendants' indemnity obligations under the bond.

**C.   Defendants Cannot Establish Any Claim for Breach of Good Faith or Fair Dealing.**

The Court finally considers whether XL breached any duty owed to Defendants wholly independent from XL's contractual obligations.  Arguably, Defendants could demonstrate a breach of good faith upon showing that XL issued the bond on behalf of Torchio Brothers despite considering the company a credit risk, i.e., implied in the Indemnity Agreement is XL's duty to exercise discretion when issuing bonds on behalf of Torchio Brothers, and for which XL would turn to Defendants for indemnification.

"Every party to a contract ... is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 224 (2005).  "A defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not 'violat[e] an express term of a contract.'" Id. at 226 (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 423 (1997)).  The covenant "calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." Id. at 224-25 (quoting Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130 (1965)). Said differently,

14

> [A] contract ... would be breached by a failure to perform
> in good faith if a party uses its discretion for a reason
> outside the contemplated range-a reason beyond the risks
> assumed by the party claiming the breach [or the contract
> would be breached] if the discretion-exercising party ...
> unilaterally use[s] that authority in a way that
> intentionally subjects the other party to a risk beyond the
> normal business risks that the parties could have
> contemplated at the time of contract formation.

Seidenberg v. Summit Bank, 348 N.J.Super. 243, 260 (App. Div.
2002) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 246
(2001)).

To prove a breach, however, Defendants must demonstrate that
their "reasonable expectations [were] destroyed when [XL] act[ed]
with ill motives and without any legitimate purpose." Brunswick
Hills Racquet Club, Inc., 182 N.J. at 226 (citing Wilson, 168
N.J. at 251). Defendants "'must provide evidence sufficient to
support a conclusion that the party alleged to have acted in bad
faith has engaged in some conduct that denied the benefit of the
bargain originally intended by the parties.'" Id. at 225 (quoting
23 Richard A. Lord, Williston on Contracts § 63:22, at 513-14
(4th ed. 2002)). "Proof of 'bad motive or intention' is vital to
an action for breach of the covenant." Id. (quoting Wilson, 168
N.J. at 251).

Therefore, Defendants would need to show that XL acted with
bad motive or intention when it honored the bond at issue here to
state a successful claim for breach of good faith. Although a
finding of bad faith must typically be made by a jury, see

15

<u>Seidenberg</u>, 348 N.J.Super. at 263, here there is simply nothing in the record to support such a finding.  <u>See</u> <u>Saldana</u>, 260 F.3d at 232 (quoting Fed.R.Civ.P. 56(e)("the party opposing summary judgment 'may not rest upon the mere allegations or denials of the...pleading'; its response,'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'").

  **D.  Defendants' Motion for Summary Judgment as to Their Amended Counterclaim Is Denied.**

  Defendants' "Motion to Amend and to File Counterclaim and Third-Party Complaint" was denied on March 1, 2010.  <u>See</u> Docket No. 108.  Therefore, Defendants' Motion for Summary Judgment as to their Amended Counterclaim is likewise denied.

**IV.  CONCLUSION**

  For the aforementioned reasons, Plaintiff's Motion for Partial Summary Judgment is granted.  Defendants' Motion for Summary Judgment as to the Amended Counterclaim is denied.  An appropriate Order will issue this date.


Dated: <u>March 2, 2010</u>  <u>s/Renée Marie Bumb</u>
         RENÉE MARIE BUMB
         UNITED STATES DISTRICT JUDGE